UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

JANE DOE, individually,

                            Plaintiff,

                -against-

CITY OF NEW YORK; Corrections Officer
"FIGUEROA", in his individual capacity;
Corrections Officer "PEARSON", in his individual
capacity,

                        Defendants.

------------------------------------------------------------------ x

**COMPLAINT**

Jury Trial Demanded

## NATURE OF THE ACTION

1.    This is an action to recover money damages arising out of the violation of Plaintiff's rights under the Constitution.

## JURISDICTION AND VENUE

2.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.

3.    The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 & 1343.

4.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

5.    This Court has supplemental jurisdiction over the New York State claims pursuant to 28 U.S.C. § 1367.

## JURY DEMAND

6.       Plaintiff demands a trial by jury in this action pursuant to Federal Rule of

Civil Procedure ("FRCP") 38.

## PARTIES

7.       Plaintiff Jane Doe ("Doe") is incarcerated at Rikers Island in Bronx

County in the State of New York.

8.       Defendant City of New York is a municipal corporation organized under

the laws of the State of New York.  It is authorized by law to maintain a correction

department that acts as its agent in the area of corrections and for which it is

ultimately responsible.  The City maintains the New York Department of Corrections

("NYCDOC"), which is a municipal entity created and authorized under the laws of

the State of New York.  NYCDOC is authorized by law to carry out all correction

functions for the City and assumes responsibility for the care, custody and control of

persons held by the City in correctional facilities.

9.       Defendant Police Officer Figueroa ("Figueroa") (last name alleged on

information and belief, first name unknown), at all times relevant herein, was an

officer, employee and agent of the NYCDOC involved in the transport of Plaintiff's

person as an escort in a NYDOC vehicle.  Figueroa is sued in his individual capacity.

10.      Defendant Pearson ("Pearson") (last name alleged on information and

belief, first name unknown), at all times relevant herein, was an officer, employee and

agent of the NYCDOC who was involved in the transport of Plaintiff's person as a vehicle driver of Rikers Island inmates to and from court appearances and Rikers Island. Pearson is sued in his individual capacity.

11. At all times relevant herein, all individual defendants were acting under color of state law.

## STATEMENT OF FACTS

12. On the afternoon of March 20, 2015, Figueroa and Pearson transported Doe by bus from a court appearance in Brooklyn to Rikers Island.

13. Figueroa and Pearson transported six prisoners total on the same bus.

14. Of these prisoners, five were male. Doe was the only female.

15. Until the bus arrived on Rikers Island, Defendants held Doe in a locked Protective Custody Unit ("PC Unit"), or cage, on the bus.

16. Among other things, the PC Unit is a designed to protect the prisoner inside the PC Unit from other prisoners.

17. Figueroa and Pearson kept Doe in the PC Unit that day to segregate her from the male prisoners.

18. Some of the male prisoners complimented Doe during the bus ride. Doe had a conversation with a male inmate whose name, on information and belief, was Dwyer ("Dwyer").

19. The bus arrived on Rikers Island and Defendants began unloading the

male prisoners each at their respective housing units.

20.     Otis Bantum Correctional Center ("OBCC") was one of the housing units where the bus stopped.

21.     While the bus was stopped at OBCC, Figueroa unlocked the PC Unit so that Doe was no longer physically segregate from the male prisoners.

22.     Upon information and belief, Dwyer provided compensation to Figueroa to leave him alone with Doe.

23.     Figueroa and Pearson left the bus.

24.     Dwyer approached Doe and sat next to her.  Dwyer and Doe engaged in sexual contact.

25.     Figueroa re-boarded the bus and removed Dwyer from the bus.

26.     Figueroa re-boarded the bus and told Doe that he had watched her with Dwyer.

27.     Doe told Figueroa that she was uncomfortable with his comment.

28.     Figueroa then moved Doe to the back of the bus, over Doe's protests.

29.     At the back of the bus, Figueroa pushed Doe down on a seat and said, in sum and substance, that he had been "waiting for this" to happen.

30.     Figueroa is married.

31.     As Doe intuited that Figueroa meant to assault her, she repeatedly mentioned Figueroa's wife in an effort to dissuade Figueroa from assaulting her.

32.     Figueroa moved his and Doe's clothing and pushed Doe's legs up toward her head.

33.     Plaintiff pleaded with Figueroa to use a condom.

34.     Figueroa ignored Doe and penetrated her.

35.     Figueroa forcibly held Doe's arms down as he sexually assaulted her.

36.     Doe cried throughout the rape.

37.     Doe considered screaming out but chose not to scream because she realized that any officers who might respond from the OBCC were apt to be male and Doe was frightened that they might assault her as well.

38.     At some point during Figueroa's rape of Doe, Pearson boarded the bus. Figueroa told Doe that he wanted to give Pearson a show.

39.     Pearson knew what was occurring but Pearson said nothing and did nothing to intervene.

40.     Figueroa's attack continued for roughly another fifteen to twenty minutes.

41.     Doe continued crying after Figueroa ceased his attack.

42.     As Figueroa dressed himself, he asked Doe to tell him the age of her daughter, then told Doe that he wanted to have sex with her again.

43.     Figueroa then looked at what Doe believed to be a calendar showing her next court date, which made Doe fearful that Figueroa intended to victimize her

again.

44.     Pearson told Figueroa to clean up his mess.

45.     Doe put her clothes back on and the bus proceeded to the Rose M. Singer Center ("RMSC") where Doe was being held.

46.     Protocol held that Figueroa and Pearson, or any officer on transportation duty, would have accompanied Doe into the RMSC on arrival.

47.     On this occasion, Figueroa and Pearson sent Doe to walk from the bus to RMSC alone without handcuffs.

48.     A female intake officer manning the RMSC door noted Doe's unaccompanied arrival and asked Doe about it.

49.     Doe, still in shock, did not respond to the female intake officer's remark.

50.     The next day, Doe suffered from abdominal pain, sore wrists and legs.

51.     A priest was working at RMSC inmates the day after the incident in question.

52.     Doe told the RMSC priest, who offered to report the incident on her behalf.

53.     Doe was frightened that Figueroa and Pearson would retaliate against her if they learned she had reported the incident to anyone and she asked the RMSC priest for time to think and seek counsel from others as to what she should do.

54.     Shortly thereafter Doe reported Figueroa's assault to a social worker and

appropriate authorities at Rikers Island were informed.

55.     Upon information and belief the City took no action against either Figueroa or Pearson.

56.     Upon information and belief both Figueroa and Pearson are still employed by the City, work at Rikers Island, receive benefits and have contact with inmates.

57.     Upon information and belief, no disciplinary action has been taken against Figueroa or Pearson and Figueroa has not been prosecuted for his criminal conduct.

58.     Within ninety days after the claim alleged in this Complaint arose, a written notice of claim was served upon defendants at the Comptroller's Office.

59.     At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

60.     This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

61.     Doe suffered damage as a result of Defendants' actions.  Doe's physical injuries include but are not limited to abdominal pain, sore wrists and legs, vomiting and loss of appetite.  Doe's mental and emotional injuries include but are not limited to severe anxiety and depression.

**There Is A Culture Of Rape And Other Sexual Abuse Of Women Incarcerated At Rikers Island**

62.     New York State has recognized the coercive power corrections officers wield over incarcerated individuals, and the related risk of rape and other sexual abuse, by criminalizing all sexual activity between incarcerated individuals and the correctional staff in New York Penal Law §130.05(3)(f), New York Penal Law §130.25(1), and New York Penal Law §130.40(1). The City is aware that New York State has identified a significant risk of coercion of individuals in custody, but nonetheless permits a culture of systemic rape and other sexual abuse of prisoners by corrections officers at Rikers Island.

63.     Rape and other sexual abuse of women is commonplace at RMSC. Upon information and belief, Plaintiff is just one of many women who have been victimized by correction officers.

64.     A United States Department of Justice ("DOJ") survey found RMSC to be one of the twelve worst jails in the country in terms of staff sexual misconduct.[1] Nationwide, 3.2% of jail inmates reported sexual victimization, but at RMSC the rate

---

[1] See Allen J. Beck et al., Bureau of Justice Statistics, U.S. Dep't of Justice, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-2012, at 13 (2013) (hereinafter the "DOJ Survey"), *available at* http://www.bjs.gov/content/pub/pdf/svpjri1112.pdf (last accessed Nov. 2, 2015); James Ridgeway & Jean Casella, *America's Worst Prisons: Rikers Island, available at* http://www.motherjones.com/politics/2013/05/america-10-worst-prisons-rikers-island-new-york-city (last accessed Nov. 2, 2015).

was 8.6%, and sexual victimization rates were higher at RMSC than at the other Rikers jails in the survey.   RMSC also has the country's highest rate of non-violent staff sexual coercion of inmates.

65.   According to the DOJ survey, approximately 5.9% of RMSC inmates reported sexual abuse by staff.[2]

66.   Despite these statistics, City of New York Public Advocate Letitia James states in an October 9, 2015 affidavit that Rikers Island failed to pursue 98% of sexual abuse complaints made in 2015.   See http://www.huffingtonpost.com/entry/rikers-island-rape-report_562673c8e4b0bce3470258d2 (last accessed Nov. 2, 2015) (stating that of the 116 complaints made, officials only pursued two).

67.   The City operates ten jails on Rikers Island, four houses of detention, court pens in the five boroughs and two hospital wards.   In the past year, City facilities have held over 80,000 inmates, with an average daily population of over 11,000.   The RMSC population is approximately 1,000 women at any given time.[3]

---

[2] See DOJ Survey at 71.

[3] See id. at 13-14.

68.     The majority of inmates are pretrial detainees, who as of 2012 remain in City custody for an average of fifty-four days, and only are incarcerated at Rikers because they are indigent and cannot afford modest or low bail.[4]

69.     Sexual abuse by staff in prisons and jails is a vastly unreported crime.[5]  A report by the United States Attorney's Office for the Southern District of New York detailing the results of a recent Rikers investigation conducted pursuant to the Civil Rights of Institutionalized Persons Act expressed "concern that DOC may be under-reporting sexual assault allegations."[6]  This under-reporting of staff-on-inmate sexual assault suggests that the numerous instances in which correctional staff at Rikers have been investigated and convicted of criminal sexual misconduct against inmates represent only a small fraction of the actionable sexual abuse that occurs at Rikers Island.

---

[4] See New York City Department of Correction, 1st Quarter Fiscal Year 2012, July-September, available at http://www.nyc.gov/html/doc/downloads/pdf/doc_at_a_glance.pdf (last accessed Nov. 2, 2015).

[5] U.S. Dep't of Justice, Regulatory Impact Assessment for PREA Final Rule, at 17-18 (May 17, 2012), available at http://www.ojp.usdoj.gov/programs/pdfs/pre-ria.pdf (concluding, based

[6] The U.S. Attorney's Office for the Southern District of New York, CRIPA Investigation of the New York Department of Correction Jails on Rikers Island (2014), available at http://genius.com/Preet-bharara-rikers-report-i-chaos-at-rikers-annotated (last visited May 15, 2015).

70.     One reason sexual assault is rarely reported is due to the trauma and stigma associated with it. The fear and trauma is exacerbated for the more than 80% of women in custody who experienced sexual or physical assault before incarceration.[7] Because childhood abuse is often perpetrated by a friend or family member, many women experience intense confusion about abusive treatment. As a result, they may have problems setting appropriate boundaries and are more vulnerable to abuse, particularly by men in authority. Their apprehension about reporting sexual assault is heightened because their prior reports may have been ignored or caused the destruction of their families.

71.     People who experienced prior abuse are more likely to be subject to abuse and less likely to complain.[8] Women may also mistakenly feel complicit in their sexual abuse, if, for example, they engaged in sexual conduct with an officer in

---

[7] *See, e.g.*, Angela Browne et al., *Prevalence and Severity of Lifetime Physical and Sexual Victimization Among Incarcerated Women*, 22 Int'l J.L. & Psychiatry 301, 310-22 (1999) (study of women in New York State's Bedford Hills Correctional Facility finding that a majority of the women studied had experienced physical or sexual abuse in their lifetime, 82% had been severely physically or sexually abused during childhood, and 75% had suffered serious physical violence by an intimate partner during adulthood).

[8] *See, e.g.*, Cindy L. Rich et al., *Child Sexual Abuse and Adult Sexual Revictimization, in From Child Sexual Abuse to Adult Sexual Risk: Trauma, Revictimization and Intervention* 49 (Linda J. Koenig et al., eds., 2004) (review of nine studies investigating the relationship between childhood sexual abuse and subsequent sexual assault revealed consistent support for phenomenon of revictimization, with each study finding women with a history of childhood abuse two to three times more likely to experience adult sexual abuse compare with women who did not experience earlier abuse).

exchange for some quid pro quo.  In reality, however, an incarcerated woman has no practical way of saying "no."

72.     In addition, victims of abuse do not come forward because they do not think they will be believed.  They are correct.[9]  Without physical proof, which is difficult to obtain, the reality is that the word of a correction officer will almost always be credited over that of an incarcerated woman.  Repeated credible complaints lodged against an officer and indicia of misconduct are frequently ignored without physical proof.  Even if the incarcerated woman has physical proof of the abuse, the officer may be permitted to continue guarding female inmates, often alone and at night.

73.     Victims of sexual abuse are afraid of being disciplined for admitting to the sexual contact or for lying about it if they are not believed.  Retaliation is a risk for all incarcerated individuals who complain about their treatment, but the likelihood of retaliation or intimidation is especially great in response to complaints about staff sexual abuse.

---

[9] *Survey of Sexual Violence in Adult Correctional Facilities, 2009-11 – Statistical Tables*, at 7-8 (2014), http://www.bjs.gov/content/pub/pdf/sscanf0911st.pdf (In 2011, New York State, with a population of approximately 55,000, had 184 allegations of staff sexual misconduct and substantiated four.  As to staff sexual harassment (which is defined as verbal harassment) New York had 24 allegations and substantiated two.  With respect to inmate-on-inmate sexual abuse, of 60 allegations of nonconsensual sexual acts, five were substantiated, while three of fourteen allegations of abusive sexual contact were substantiated.).

74.    The sexual abuse experienced by Doe was a common experience at RMSC, as evidenced by the fact that the DOJ survey, approximately 5.9% of the RMSC population has reported sexual abuse.[10]

75.    Upon information and belief, Pearson's failure to intervene or to report Figueroa's rape of Doe signals the systematic lack of response to sexual abuse of female prisoners at RMSC.

76.    Upon information and belief, Figueroa is still employed by the City, works at Rikers, is still receiving his benefits and remains entitled to a pension, and has contact with Rikers inmates.

77.    Figueroa's review of Doe's transport schedule because he wanted to assault her again indicates why Defendants' failure to intervene and failure to report contributed to past and perpetuated future violations of Doe's constitutional rights.

78.    Nor is Figueroa the only RMSC correction officer who has raped or otherwise sexually abused the women in his care.  Upon information and belief, at least seven other correction officers at RMSC, besides Figueroa, have sexually abused incarcerated women.

_____

[10] Allen J. Beck et al., Bureau of Justice Statistics, U.S. Dep't of Justice, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-2012, at 13 (2013) (hereinafter the "DOJ Survey"), available at http://www.bjs.gov/content/pub/pdf/svpjril112.pdf.

79.     On information and belief, NYCDOC Officer 1 was caught abusing women multiple times and also impregnated a female detainee.  Upon information and belief, NYCDOC Officer 1 is still employed by the City, works at RMSC, and has continuing contact with women in custody.

80.     On information and belief, NYCDOC Officer 2 raped at least two women at RMSC and may have impregnated one of these women.  He also touched multiple inmates in an unwelcome and inappropriate sexual manner in front of other inmates and officers.

81.     On information and belief, NYCDOC Officer 3 raped at least one woman at RMSC and may have impregnated her.  On information and belief, NYCDOC Officer 3 abused numerous women by subjecting them to unwanted sexual touching.  On information and belief, NYCDOC Officer 3 is still employed by the City, works at RMSC and has continuing contact with women in custody.

82.     On information and belief, NYCDOC Officer 4 abused women through unwanted sexual touching.  On information and belief, NYCDOC Officer 4 is still employed by the City, works at RMSC and has continuing contact with women in custody.

83.     On information and belief, NYCDOC Officer 5 had sexual intercourse with at least one incarcerated woman.  On information and belief, NYCDOC Officer

5 is still employed by the City, works at RMSC and has continuing contact with women in custody.

84.     On information and belief, NYCDOC Officer 6 has sexually abused several women.  On information and belief, NYCDOC Officer 6 is still employed by the City, works at RMSC and has continuing contact with women in custody.

85.     On information and belief, NYCDOC Officer 7 masturbated while watching a woman sleep in her cell and ejaculated on the sheets of her bed.  On information and belief, NYCDOC Officer 7 is still employed by the City, works at RMSC and has continuing contact with women in custody.

### FIRST CLAIM

### The City Is Deliberately Indifferent To Correction Officers' Sexual Abuse Of Women In DOC Custody

86.     The City, which through DOC, is responsible for the care, custody and control of female detainees and City-sentenced inmates, has, through its acts and omissions, facilitated the rape and sexual abuse of the women committed to its custody.

87.     The City's failure to institute adequate safeguards in its hiring practices for correction officers demonstrates its deliberate indifference to the safety and well-being of women in its custody.  In a January 2015 report, DOI found that over one-third of recently hired correction officers had significant warning signs in their

backgrounds—including criminal histories of domestic violence and improper preexisting relationships with incarcerated individuals.

88.     The City knows that correction officers subject women at RMSC to recurrent and ongoing acts of rape and other sexual abuse.  These include forced sexual intercourse, oral sexual acts, sexual touching, public masturbation, demeaning sexual comments, and physical and verbal intimidation to deter women in custody from reporting such sexual abuse.

89.     The City assigns male correction officers to guard women without adequate safeguards to prevent rape and other sexual abuse.  Male correction officers are assigned to posts in which they have unmonitored contact and complete discretion and control over incarcerated women.   For example, a single male correction officer is often assigned to dormitory areas during nighttime hours.

90.     Correction officers who rape and sexually abuse incarcerated women routinely leave their assigned posts, allow the women into areas where they are not permitted, and engage in open and public behavior that is obviously suggestive of inappropriate personal relationships and sexual abuse.   Officers provide certain women with contraband items, are seen walking arm-in-arm throughout the jail with certain women, and grant some women special privileges, such as allowing them out of their cells when they should be locked in or permitting them to speak to those in punitive segregation.  These behaviors are visible to staff and prisoners alike, so that it

is known which correction officers are raping and sexually abusing which women. The City has failed to take action despite knowledge of these activities and has not enforced policies intended to identify, address and prohibit sexual abuse of inmates by correction officers.

91.    The City permits correction officers virtually unfettered access to unmonitored areas such as kitchen store rooms, storage closets, pantries and transportation vehicles where they can rape and sexually abuse women with minimal risk of detection.

92.    The City has failed to ensure that security cameras are installed in these high-risk areas and, where cameras are installed, has failed to ensure that they are functional.

93.    The City has failed to employ obvious measures to reduce the risk of rape and sexual abuse of incarcerated women by correction officers, such as heightened monitoring of behavior indicative of ongoing sexual abuse, appropriately placed and functional surveillance cameras installed and maintained without staff knowledge, exit interviews of incarcerated women upon transfer or release, random interviews of staff, and more frequent, unannounced rounds by supervisory officials.

94.    The City's system for the reporting and investigation of rape and sexual abuse is grossly inadequate.  It relies almost entirely on incarcerated women reporting

their own rape and sexual abuse and then fails to take appropriate action to protect those who do come forward or to punish their abusers.

95.     The City has failed to train staff to take reports of rape and sexual abuse seriously and to give adequate weight to the credibility of inmate witnesses.

96.     Pursuant to City policy and practice, incarcerated women who report rape and sexual abuse by correction officers are not protected from retaliation by correction officers and other inmates.

97.     The City does not consistently investigate reports of rape or sexual abuse in a prompt or thorough manner, if at all.  Once a woman reports that she has been raped or otherwise sexually abused, weeks can pass before an investigation begins. Regardless of what an investigation reveals, officers are rarely disciplined, and women are rarely informed of the outcome.

98.     The City treats incarcerated women as adversaries rather than allies.  In the case of Jane Doe, for example, the City not only failed to investigate her allegations against Defendant Figueroa in a timely manner once she reported the sex abuse.

99.     After reporting Figueroa's abuse, Plaintiff actively cooperated with the City.

100.    Plaintiff spoke to City and law enforcement investigators detailing the abuse.

101.    The City's long-standing failure and/or refusal to supervise the corrections officers under its control, and its supervisory staff, is now so institutionalized as to constitute a policy or custom of tolerating and authorizing the abuse alleged herein. It is this policy and custom of abuse and cover-up that caused the deprivation of Plaintiff's rights.

102.    Said policy and custom is further evidenced by frequent and significant findings of misconduct over a period of years by commissioners, command personnel, supervisors, site medical directors, and the officers that they supervise.

103.    The failures and the refusals by the City to hold these officers accountable is a proximate cause of the injuries sustained by the plaintiff, and undoubtedly hundreds of other inmates.

104.    Through promotions and other financial and status incentives, the City has the power to reward officers who perform their job adequately and to punish – or at the very least fail to reward – those who do not. The City's actions and omissions have created and maintained the perception among high-ranking supervisors that a supervisor who turned a blind eye towards evidence of sexual harassment and

intimidation, sexual abuse and rape by corrections officers, and fails to report or investigate these instances, will suffer no damage to his career or financial penalty.

105.   The pattern of unchecked sexual abuse by officers and the persistent refusal or failure of the City and DOC to supervise these persons properly and to take action to curb the misconduct, demonstrates a policy of deliberate indifference that tacitly authorizes the abuses claimed by Plaintiff.

106.   The foregoing customs, policies, usages, practices, procedures and rules of the City and DOC constituted deliberate indifference to the safety, well-being and constitutional rights of the Plaintiff and were the direct and proximate cause of the constitutional violations suffered by the Plaintiff as alleged herein.

107.   As set forth above, the City failed to protect Plaintiff from the known and dangerous harms.

108.   As set forth above, the City failed to intervene, mitigate and/or stop the events alleged herein.

109.   As set forth above, the City knew of and consciously disregarded an excessive risk to Plaintiff's health and safety.

110.   Due to the City's practices and policies aforesaid, the plaintiff suffered and continues to suffer physical, psychological and emotional injuries, pain and suffering.

## SECOND CLAIM

### PLAINTIFF'S DUE PROCESS CLAIM AGAINST
### DEFENDANT FIGUEROA

111.   Plaintiff repeats and realleges each of the allegations contained in this Complaint as if fully set forth herein.  At all relevant times, Figueroa was acting in his capacity as a correction officer employed by the City.

112.   At all relevant times, Figueroa was acting under color of state law.

113.   Figueroa raped, sexually abused and threatened Plaintiff with future sexual assault as detailed herein.

114.   As a result of the abuse, Plaintiff suffered severe physical harm and suffered and continues to suffer psychological and emotional distress.

115.   By virtue of his rape and sexual abuse, Figueroa deprived Plaintiff of her Fourth, Fifth and Eighth Amendment rights under the Fourteenth Amendment to the United States Constitution.

## THIRD CLAIM

### PLAINTIFF'S FAILURE TO INTERVENE

116.   Plaintiff repeats and realleges each and every allegation in this Complaint as if fully set forth herein.

117.    Defendant Pearson had an opportunity to prevent Defendant Figueroa's sexual assault as it occurred, had a duty to intervene and prevent such conduct and failed to intervene.

118.    Accordingly, Defendant Pearson violated Doe's rights under the Fourth, Fifth, Eighth and Fourteenth Amendments.

119.    As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## FOURTH CLAIM

## FOURTH, FIFTH, EIGHTH AND FOURTEENTH AMENDMENT CLAIMS AGAINST THE CITY

120.    Doe repeats and realleges each and every allegation in this Complaint as if fully set forth herein.

121.    The acts complained of were carried out by the aforementioned individual Defendants in their capacities as correctional officers, pursuant to the customs, usages, practices, procedures and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

122.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or

rule of his/her respective municipality/authority, which is forbidden by the Constitution of the United States.

123.   The City, through that custom, usage, practice, procedure or rule, caused Doe to be subjected to rape and the express threat of rape in violation of her Fourth, Fifth, Eighth and Fourteenth Amendment rights. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

## FIFTH CLAIM

### State Law False Imprisonment

124.   By their conduct, as described herein, the individual defendants are liable to plaintiff for falsely imprisoning.

125.   Plaintiff was conscious of her confinement.

126.   Plaintiff did not consent to her confinement.

127.   Plaintiff's confinement was not otherwise privileged.

128.   Defendant City of New York, as an employer of the individual defendant officers, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

129.   As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

## SIXTH CLAIM
## Negligent Hiring/Training/Retention/Supervision Of Employment Services

130.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

131.   Defendant City, through NYCDOC, owed a duty of care to plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to plaintiff or to those in a like situation would probably result from the foregoing conduct.

132.   Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

133.   Upon information and belief, defendant City knew or should have known through the exercise of reasonable diligence that the individual defendants were potentially dangerous.

134.   Upon information and belief, defendant City's negligence in screening, hiring, training, disciplining, and retaining these defendants proximately caused each of plaintiff's injuries.

135.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## SEVENTH CLAIM
### Intentional Infliction of Emotional Distress

136.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

137.   By reason of the foregoing, and by assaulting, battering, sexually assaulting, failing to prevent other defendants from doing so, or causing an unlawful seizure and extended detention without due process, the defendants, acting in their capacities as CORRECTIONS officers, and within the scope of their employment, each committed conduct so extreme and outrageous as to constitute the intentional infliction of emotional distress upon Plaintiff.

138.   The intentional infliction of emotional distress by these defendants was unnecessary and unwarranted in the performance of their duties as corrections officers.

139.   Defendants, their officers, agents, servants, and employees were responsible for the intentional infliction of emotional distress upon Plaintiff. Defendant City, as employer of each of the defendants, is responsible for their wrongdoings under the doctrine of *respondeat superior*.

140.   As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## EIGHTH CLAIM
### State Law Assault and Battery

141.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

142.   By their conduct, as described herein, the defendants are liable to plaintiff for having assaulted and battered her.

143.   Defendant City of New York, as an employer of the individual defendant officers, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

144.   As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

## NINTH CLAIM
### SEXUAL ASSAULT AND RAPE

145.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

146.   As set forth above, defendant Figueroa did sexually harass and intimidate Plaintiff.

147.   As set forth above defendant Figueroa did have vaginal sex with Plaintiff.

148.   Pursuant to New York Penal Law §130.05(3)(f), Plaintiff, as a matter of law, is deemed incapable of consenting to have sex with CO Figueroa.

149.   As set forth above, Figueroa did sexually assault and rape Plaintiff.

150.   As set forth above, Figueroa did consciously commit criminal wrongdoing.

**151.**   As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully requests judgment against defendants as follows:

(a)  Compensatory damages against all defendants, jointly and severally;

(b)  Punitive damages against the individual defendants, jointly and severally;

(c)  Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and

(d)  Such other and further relief as this Court deems just and proper.

DATED:     November 20, 2015
           New York, New York

                         ____/s_____

                         Robert Marinelli
                         305 Broadway, 9th Floor
                         New York, New York 10007
                         (212) 822-1427

                         *Attorney for Plaintiff*